UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

---

Inetta Burns,

          Plaintiff,

v.                               Case No. 15-cv-6163

Wal-Mart Stores, Inc.,         Judge: John W. Darrah

          Defendant.           Magistrate Judge: Daniel G. Martin

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Inetta Burns ("Burns"), by and through her attorneys, submits this Response in Opposition to Defendant Wal-Mart Stores, Inc.'s ("Wal-Mart") Motion for Summary Judgment.

## INTRODUCTION

Along with over 1.5 million women, Burns became part of the nationwide class action *Dukes v. Wal-Mart* after Betty Dukes and other women courageously came forward to oppose the discriminatory treatment handed down from the largest retailer in the world. The *Dukes* plaintiffs set forth eerily similar complaints of an organization where women are less valued, irrespective of their positive performance, qualifications, and aspirations to advance. Indeed, the *Dukes* Court acknowledged that the plaintiffs demonstrated that "women working in Wal-Mart stores are paid less than men *in every region,* that pay disparities exist *in most job categories . . .,* and that the higher one looks in the organization, the lower the percentage of women." *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 155 (N.D. Cal. 2004) (emphasis added). Burns was no exception to Wal-Mart's discriminatory practices. Her male managers thwarted her goal to be an

1

Assistant Manager in the new Wal-Mart store in her community and did not award her other promotions to which she applied. Burns also received unequal pay compared to her male peers.

Ultimately, the Supreme Court rejected the *Dukes* class based on Rule 23 criteria, not on the merits of the case. While disappointed with this result, Burns remains undeterred and is now before this Court in her individual capacity to finally hold Wal-Mart accountable for its discriminatory conduct. Because a reasonable jury could find that Wal-Mart discriminated against Burns due to her gender, its Motion for Summary Judgment should be denied.

## STATEMENT OF FACTS[1]

### A. Burns' Goal to Work in the Glenwood, Illinois Wal-Mart Store

Burns has worked at Wal-Mart for the past 11 years. (DPSOF ¶ 1.) She has decades of retail and management experience: before Wal-Mart, she was a manager at K-Mart for 15 years, a shipping and receiving supervisor at NK Parts for five years, a senior sales representative for DirectTV for six years, and she spent six years as a program Coordinator at Jones Memorial Community Center. (DPSOF ¶ 4; PSOAF ¶ 1.) She holds an associate's degree in Computer Information Systems and is also a certified mediator. (PSOAF ¶ 1.)

In approximately 2004, Burns learned Wal-Mart had purchased a property five blocks from her home in Glenwood, Illinois and planned to build a new store at the location. (PSOAF ¶ 2; DPSOF ¶ 6.) Burns was determined to work as an assistant manager at the new store. (PSOAF ¶ 3.) In pursuit of her goal, she began contacting regional and district managers, including Wal-Mart's District Manager Lance Buser. (*Id.*) When Burns later interviewed with Buser for an assistant manager position, she "made it clear, crystal clear to him" that her goal was to work at the Glenwood store. (PSOAF ¶ 4.) Buser told Burns that if she wanted to work

---

[1] Defendant's Local Rule 56.1(a)(3) Proposed Statement of Material Facts are cited as "DPSOF ¶ __." Burns' Local Rule 56.1(b)(3) Statement of Additional Facts are cited as "PSOAF ¶ __."

2

in Glenwood, he would ensure it happened. (*Id.*) Burns was hired on January 10, 2005. (DPSOF ¶ 5.)

### B. The Management-In-Training Program

Before becoming an Assistant Manager, Burns had to attend Wal-Mart's Management-in-Training ("MIT") program. (DPSOF ¶ 5.) The MIT program lasts for approximately six to eight weeks and consists of on-the-job training and learning about Wal-Mart's policies, procedures, and culture. (PSOAF ¶ 5.) The classes were held Monday through Friday from 8:00 a.m. to 5:00 p.m. and were led by an instructor. (*Id.*) Although the MIT program was held at a Wal-Mart store two hours away from Burns' home, she tolerated the four-hour daily commute, losing a transmission due to the long commute, having to stay in a hotel in inclement weather, and spending significant money on fuel because she was excited about working in the new Glenwood store. (PSOAF ¶ 6.)

Burns excelled in the MIT program. (PSOAF ¶ 7.) She was complimented on her "positive 'can do' attitude," great work ethic, being a "good people person," and the belief that she "will become a great merchant." (*Id.*) She also became close with approximately five of the trainees in the program, including males Jesus Valdez and Gewargis (George) Tammo. (PSOAF ¶ 8.) Valdez and Tammo would talk about their pay in front of Burns, and she recalled their pay being more than she earned. (PSOAF ¶ 9.) Burns also learned that Valdez and Tammo had less experience then she did: Tammo did not have any prior retail experience and Valdez did not have any management experience. (*Id.*)

Throughout the MIT program, Burns continually repeated her goal to work in the Glenwood store. She sent a letter to Buser on March 14, 2005 to reiterate that her "goal with Wal-Mart is still the same" and reminded him that she wanted to be assigned to the Glenwood

3

store as soon as it opened. (PSOAF ¶ 10.) But, because the store would not be open when she finished the MIT program, Burns proposed that she could temporarily work at the Orland Hills store. (*Id.*) In her MIT review in mid-May, 2005, Burns again noted her plan to "be a part of the management team at the Glenwood store when they have their Grand Opening and move on up with the company." (PSOAF ¶ 11.) The review was signed and acknowledged by Buser, her manager Patrick Rheams, and her Sponsor Nicholas Yount. (*Id.*)

### C. Wal-Mart Reneges on its Promise to Burns

Burns again contacted Buser on May 17, 2005 and reminded him about her "goal to be a part of the new store in Glenwood Illinois when it open [sic]." (PSOAF ¶ 12.) But this time, Buser told Burns she needed to speak with Chad Doneth, who he believed was the District or Market Manager. (*Id.*) Burns called Buser the following morning and replied to his email. (PSOAF ¶ 13.) In the email, she expressed her hope that Buser could explain the next steps she needed to take to get to the Glenwood store. (*Id.*) She also mentioned she did not want to make any enemies because she was persisting in holding Buser and other Wal-Mart employees to their promise that she could work at the Glenwood store. (*Id.*) This time, Buser responded that Burns needed to speak with new District Manager J.D. Hacker. (PSOAF ¶ 14.)

Burns contacted Hacker as directed, but Hacker said Burns could not work in the Glenwood store because Wal-Mart maintained a policy whereby new assistant managers could not work in new stores. (PSOAF ¶ 16.) Burns was devastated. (PSOAF ¶ 17.) Because this was completely opposite from what she had previously been promised—and she had never been told of this alleged policy until this point—she called the Regional Manager to check into this alleged policy. (*Id.*)

4

In fact, Wal-Mart does not maintain any such policy. (PSOAF ¶ 18.) Buser's policy was to place managers where they were most needed, rather than categorically refusing to place new managers in new stores. (PSOAF ¶ 19.) Hacker also admits there was no such policy, and it was "not unheard of" to place a new manager in a new store. (*Id.*) To the extent there was any *preference* not to put "new" managers in new stores, Wal-Mart would consider management experience at similar retailers. (PSOAF ¶ 18.)

The Regional Manager told Burns he would speak with Hacker. (PSOAF ¶ 17.) In subsequent calls with Hacker, he told Burns just to accept what happens. (PSOAF ¶ 20.) Throughout this time, Burns knew there were plenty of openings at the Glenwood store because it was hiring for all open positions. (*Id.*)

### D. Burns Becomes an Assistant Manager

Meanwhile, Burns finished the MIT program and was placed in the Matteson, Illinois store as an Assistant Manager. (DPSOF ¶ 9.) Burns soon discovered that the Mattson store was in disarray: rather than sorting the freight and putting it on the shelves, it had built up in front of the exits to a point that the fire marshal was about to close the store. (PSOAF ¶ 21.) Burns also had a peg board fall on her although she was not injured. (*Id.*) Due to the state of the store, she contacted Hacker to request a transfer. (*Id.*)

Burns' transfer request was approved and she was moved to the Bradley-Bourbonnais store. (PSOAF ¶ 22.) However, the Store Manager and Co-Manager at the Bradley store treated Burns and the other female assistant manager worse than the male managers. (PSOAF ¶ 22.) For example, the Store Manager would require Burns and the other female to unload the delivery trucks, which required significant lifting, while the males were given easier tasks on the store

5

floor. (*Id.*) Based on the unfair work assignments, and Wal-Mart's refusal to assign her to the Glenwood store, Burns stepped down as Assistant Manager. (PSOAF ¶ 23.)

### E. Burns Transfers to Glenwood

By this time, the Glenwood store had opened. (PSOAF ¶ 24.) Burns went to the store to inquire about an Assistant Manager position, but was hired as a sales associate. (PSOAF ¶ 24.) Once she was at Glenwood, to her surprise, she saw "new" assistant managers from her MIT program working in the store, including Tammo. (PSOAF ¶ 25.)

Tammo was working in the Tire Lube Express ("TLE") Department. (DPSOF ¶ 21.) The TLE department does not require any special education or experience. (PSOAF ¶ 26.) While it was referred to as a specialty department, the specialty departments were ultimately all part of the store. (*Id.*) Some managers were even placed in the TLE division for a few months before being returned to the other divisions within their store. (*Id.*)

### F. Wal-Mart Refuses to Promote Burns to Support Manager

In 2009, Burns was interested in a promotion to Support Manager. (PSOAF ¶ 28.) Moving from an hourly associate to a Support Manager would result in higher pay. (*Id.*) Burns took and passed a management assessment through Wal-Mart's Career Preferences computer system, which is one of the requirements for the position. (*Id.*) She then used the system to indicate that she wanted to transfer to a Support Manager position. (PSOAF ¶ 29.) Burns learned a male was hired as Support Manager. (*Id.*)

### G. Pay Inequity and Unequal Treatment at Wal-Mart

Burns also learned through conversations with other employees that female employees were paid less than males. (PSOAF ¶ 30.) She first had those conversations while in the MIT program, and they persist to this day. (*Id.*)

6

Once they finished the MIT program and became Assistant Managers, Tammo, Valdez, and Burns were paid the same salary—$▮ every two weeks. (PSOAF ¶ 31.) However, Tammo and Valdez were in the TLE department, which should be a lower-paid position. (*Id.*)

When Burns stepped down from Assistant Manager, her pay was reduced to $8.70 per hour. Male employees who demoted from Assistant Manager to hourly associates were paid significantly more. For example, Douglas Gugudan was hired directly into Wal-Mart's training program (like Burns), became an Assistant Manager in the Bradley-Bourbonnais store, and demoted to Sales Associate in August 2005 like Burns. (PSOAF ¶ 32.) However, Gugudan received an hourly rate of $▮/hour upon transitioning to an hourly position—$▮ per hour more than Burns. (*Id.*)

Similarly, Richard Straton was hired as a Sales Associate at the Glenwood store in August 2005 at the same time as Burns transferred into the store. (PSOAF ¶ 33.) Straton was paid $▮ per hour, and was given a raise to $▮ per hour within a few months. (*Id.*) Burns had been at Wal-Mart longer, had been an Assistant Manager, and had decades of retail experience, yet was only paid $8.70. (*Id.*; PSOAF ¶ 1.)

As another example, William Kendrick, who entered the MIT program three years before Burns, was paid over $▮ more per hour while in the program, and started as an Assistant Manager at $▮ per pay period compared to Burns' $1,230.77. (PSOAF ¶ 34.) The extra pay came from Hacker. (*Id.*)

Wal-Mart granted flexibility to its managers in determining pay. (PSOAF ¶ 35.) Managers also altered scores to ensure a larger raise for select employees: in one instance a male employee's review score was blue-penciled and he was given a ▮% raise, even though raises were supposed to be limited to 5%. (PSOAF ¶ 36.) Hacker signed off on this review. (*Id.*)

Wal-Mart received at least 16 complaints of gender discrimination form Burns' districts during her employment. (PSOAF ¶ 37.)

## ARGUMENT

### I. LEGAL STANDARD

Summary judgment is not appropriate unless the moving party can establish that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party meets this burden, the non-moving party may produce evidence demonstrating that there is a dispute of material fact to be resolved by the jury. *Id.* The court must construe the evidence—and grant all reasonable inferences—in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This Circuit "appl[ies] the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491 (7th Cir. 2000).

### II. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON BURNS' CLAIMS

Burns alleges Wal-Mart discriminated against her on the basis of sex in direct violation of Title VII. Under Title VII, "[i]t shall be an unlawful employment practice for an employer to ... discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ..." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may establish Title VII discrimination through the direct or indirect method. *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013) (citations omitted). Under the indirect model, a plaintiff may avoid summary judgment by establishing a prima facie case of discrimination according to the *McDonnell Douglas* formula—a burden that is "not onerous." *Lewis v. City of Chicago*, 496 F. 3d 645, 650

8

(7th Cir. 2007); *Coleman v. Donahoe*, 667 F. 3d 835, 846 (7th Cir. 2012). Because Burns can demonstrate Wal-Mart discriminated against her in both pay and promotion, Defendant's motion must be denied.

### A. Wal-Mart Discriminated Against Burns by Failing to Pay Her Equally

The first component of Burns' discrimination claim relates to the unequal pay she received. A prima facie case of disparate pay under Title VII requires a showing that: "(1) she is a member of a protected group; (2) she was fulfilling her employer's legitimate performance expectations; and (3) she suffered an adverse employment action in that she was paid a lower salary than a 'similarly situated' nonprotected class member." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 274 (7th Cir. 2004). Wal-Mart does not dispute that Burns is a member of a protected class or that she was meeting its expectations. (Def. Mem. at 6.) Burns can easily establish that she was paid unequally to similarly situated male employees.

The "similarly situated" analysis requires "a 'flexible, common-sense' examination of all relevant factors." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)). Similarly situated employees need not be identical in every conceivable way, nor clones of the plaintiff. *Coleman*, 667 F.3d at 846. Instead, "so long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied." *Id.* Whether another employee is similarly situated to the plaintiff is usually a determination for the fact finder, and summary judgment is appropriate only where no reasonable fact finder could find in the plaintiff's favor. *Id.* at 846-847.

First, Burns was paid significantly less than Assistant Manager Kendrick. Both Burns and Kendrick were hired directly into the MIT program and had equal tenure at Wal-Mart.

9

However, Kendrick was paid over $█ more per hour than Burns while in the program. Once the two became Assistant Managers, Kendrick earned over $█ more per pay period than Burns.

Burns was also discriminated against when she received the same rate of pay as her fellow MIT peers Tammo and Valdez once all three became Assistant Managers. Wal-Mart claims that it could not have acted discriminatorily because Burns and Tammo received equal pay. (As described in Section B, *infra*, this argument is important because it directly contradicts Wal-Mart's defense to Burns' promotion claim.)

All assistant managers, regardless of the area in which they were ultimately placed, attended the same training program and could work in any department within the store. Tammo and Valdez became Assistant Managers in the TLE department. The TLE department did not require any special training or expertise and, although physically set off, was ultimately part of the same store structure. The department also does not have any different policies or procedures than the rest of the store. Therefore, because the departments were all part of the same store structure and were subjected to the same policies and procedures, a fact-finder could conclude Burns, Tammo, and Valdez are similarly situated. The only difference between the positions, however, is that the TLE managers were supposed to earn less. Yet, Tammo and Valdez did not. By virtue of their identical pay rates, Burns was treated unequally.

Burns was again paid unequally when she stepped down from Assistant Manager to Sales Associate. Burns was similarly situated to Gugudan: both were hired directly into the MIT program, became an Assistant Manager in the Bourbonais Store #1307, and demoted to Sales Associate in August 2005. However, Gugudan was paid $█ more per hour than Burns. Burns was also paid less than Straton, who had less experience and tenure, yet started at $█ per hour and was soon given a raise to $█ per hour.

10

Because Burns is able to prove all three elements of her prima facie case, Defendant must provide a nondiscriminatory reason for the decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Farrell v. Butler Univ.*, 421 F. 3d 609, 613 (7th Cir. 2005). If the defendant is able to do so, the burden then shifts back to the plaintiff to demonstrate that the defendant's explanation was purely pretext. *Farrell*, 421 F. 3d at 613. To prove pretext, a plaintiff must present enough evidence that a reasonable jury could infer that the discriminatory motive was the real reason for the discriminatory action. *Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 544 (7th Cir. 1998). "Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" *Gallo v. Advocate Health Care*, No. 01 C 0742, 2002 WL 1160957, at *4 (N.D. Ill. May 23, 2002) (Darrah, J.) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000)).

Wal-Mart cannot even meet its initial burden. It admits Burns was earning the same rate as Tammo once both were employed as Assistant Managers, (Def. Mem. 9), yet provides no explanation for why Tammo (and Valdez) were paid the same rate as Burns while working in a position that Wal-Mart acknowledges should receive lower pay. Wal-Mart similarly offers no explanation for why other males, including Gugudan, Straton, and Kendrick were paid more. Because Wal-Mart fails to provide any nondiscriminatory reason for its decisions, its motion must be denied.

**B.     Wal-Mart Discriminated Against Burns By Failing to Promote Her**

Wal-Mart also discriminated against Burns by failing to promote her. When a plaintiff uses the indirect method to establish a failure to promote claim, the elements of a prima facie case are slightly altered. *See Jordan v. City of Gary*, 396 F. 3d 825, 832 (7th Cir. 2005). Specifically, the plaintiff must show: (1) she is in a protected class; (2) she was qualified for the

11

position; (3) she was rejected for the position sought; and (4) the position was granted to a person outside the protected class who is similarly or less qualified than the plaintiff. *Id.* Defendant does not dispute the first or second elements. (Def. Mem. at 6.)

Burns was first rejected for a position in the Glenwood store and later forced to step down due to unfair work conditions.[2] Hacker refused to place her in Glenwood by referencing a sham "policy" that does not exist in writing nor in practice. *See Gallo*, 2002 WL 1160957, at *4 (denying summary judgment where a female plaintiff was told she did not receive a wage increase because of a budget freeze, yet executives were unaware of such a freeze). Hacker did not tell Burns there were no open positions or that he did not have authority to place her in some of the positions. Instead, he outright refused her request. Conversely, Tammo—who received the exact same training, held the same title, and was paid equally to Burns—was allowed to work in Glenwood.

In an attempt to provide justification for its conduct, Wal-Mart claims Tammo is not similarly situated because he was in the TLE department. However, this argument is incompatible with its position that Burns' pay claim must fail because she was paid the same rate as Tammo. Indeed, Wal-Mart cannot have it both ways: it cannot claim that Tammo is similarly situated for purposes of her pay claim, but not similarly situated for her promotion claim. Wal-Mart's contradicting arguments, by themselves, create issues of material fact that should be left to the jury. *See Gallo*, 2002 WL 1160957, at *4 (denying motion for summary judgment where material questions of fact existed as to whether the male employees were similarly situated). In actuality, Tammo was similarly situated. He went through the exact same training program as

---

[2] The time and expense for Wal-Mart workers to commute to and from work is a significant impediment to employment—in fact, Tammo quit Wal-Mart solely because the commute was too long for what he was being paid. (PSOAF ¶ 27.)

Burns, and the TLE department did not require any unique training or experience. And, at the end of the day, Wal-Mart cannot provide any legitimate, non-discriminatory reason for its refusals to place Burns in the Glenwood store.

Wal-Mart also denied Burns' requests for promotion to Support Manager. Burns passed the required management assessment and indicated through Wal-Mart's Career Preferences system that she wanted to transfer to a Support Manager position. Burns was well-qualified for the position, not only through her years of training and experience at Wal-Mart, but also through decades of prior retail experience. But despite her experience and discipline-free record, a male was given the position. Although Burns cannot recall his name, it does not excuse the unequal treatment.

To defend against Burns' claim, Wal-Mart claims its records do not show she applied to any such position. However, its own internal records make clear that she indicated her interest in numerous Support Manager positions in 2009. Because Wal-Mart has not articulated any justification for failing to award any of these positions to Burns, summary judgment is improper.

## CONCLUSION

Burns is able to set forth competent and sufficient evidence to support her claim of discrimination. By the well-established summary judgment standard requiring all of the evidence to be viewed in the light most favorable to Burns, and all inferences to be resolved in her favor, there are genuine issues of material fact that preclude summary judgment. For these reasons, Defendant's Motion should be denied.

Date:  September 22, 2016   **NICHOLS KASTER, PLLP**

s/Janet M. Olawsky
James H. Kaster* (WI #1001474, MN #53946)
    kaster@nka.com
Matthew H. Morgan* (MN #304657)
    morgan@nka.com
Janet M. Olawsky* (MN #393311)
    jolawsky@nka.com
80 South Eighth Street
4600 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone:  (612) 256-3200
Fax:  (612) 338-4878
*Admitted pro hac vice*

**THE PRINZ LAW FIRM, P.C.**
Kristen Prinz (IL #6291900)
    kprinz@prinz-lawfirm.com
Poonam Lakhani (IL #6306318)
    plakhani@prinz-lawfirm.com
One East Wacker
Suite 550
Chicago, Illinois 60601
Telephone: (312) 212-4450
Fax: (312) 284-4822

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

The undersigned certifies that on September 22, 2016, she electronically filed the forgoing **Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment**. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

s/Janet M. Olawsky
Janet M. Olawsky
NICHOLS KASTER, PLLP
